The Honorable Philip S. Gutierrez, United States District Judge
Before the Court are a motion for summary judgment or, in the alternative, for partial summary judgment filed by Defendants Vinod Kashyap and Shalini Kashyap ("Defendants"), see Dkt. # 80 ("Defs. Mot. "), and a motion for summary judgment filed by Plaintiff Pedram Cyrousi ("Plaintiff" or "Cyrousi"), see Dkt. # 81 ("Pl. Mot. "). Both sides have filed oppositions and replies. See Dkts. # 97 ("Pl. Opp. "), # 95 ("Defs. Opp. "), # 119 ("Defs. Reply "), # 117 ("Pl. Reply "). The Court finds the matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78 ; L.R. 7-15. Having considered the moving papers, the Court GRANTS in part and DENIES in part both motions.
I. Background [1]
In this action, Plaintiff claims that his former wife, Defendant Shalini Kashyap ("Shalini"), and father-in-law, Defendant Vinod Kashyap ("Vinod"), have breached their obligations under the Form I-864 Affidavit of Support they signed as part of Plaintiff's immigration process.
A. Factual Background
Cyrousi, a citizen of Iran and Germany, married Shalini Kashyap, a United States citizen, on November 21, 2006. See Defendants' Statement of Uncontroverted Facts , Dkt. # 80-1 ("Defs. SUF "), ¶ 7; Complaint , Dkt. # 1 ("Compl. "), ¶¶ 6, 8. Thereafter, on or about February 15, 2008, Shalini petitioned for Cyrousi to immigrate to the United States. Defs. SUF ¶ 6. As a precondition to approval of Cyrousi's application, he needed a sponsor who would sign the Form I-864 Affidavit of Support ("I-864 Affidavit"), agreeing to support him at 125 percent of the Federal Poverty Guidelines. Id. Because Shalini did not meet the statutory income requirements to serve as a *1281 sponsor by herself, her father Vinod agreed to serve as a joint sponsor. Id. Cyrousi's I-864 Affidavit was signed by Shalini and Vinod in December 2006. Id. ¶ 8. On February 15, 2008, Cyrousi was granted conditional status as a lawful permanent resident ("LPR") via a marriage-based visa. Defendants' Statement of Genuine Disputes of Material Facts , Dkt. # 95-1 ("Defs. SGF "), ¶ 10.
Sometime in late 2009 or early 2010, Cyrousi and Shalini separated. Defs. SGF ¶ 11; see also Declaration of Anya Goldstein , Dkt. # 95-4 ("Goldstein Decl. "), Ex. K. ("Pl. USCIS Affidavit "), at 1. Cyrousi and Shalini signed a document entitled "Marital Settlement Agreement" in late 2010. Defs. SUF ¶ 9.
The Marital Settlement Agreement states that "the parties intend this Agreement to be a final and complete settlement of all of their rights and obligations as between them, including property rights and property claims, and the right of either Wife or Husband to spousal support." See Declaration of Shalini Kashyap , Dkt. # 80-3, Ex. A ("Marital Settlement ") at 4. The Defendants' I-864 obligation is not specifically mentioned in the agreement, nor is Plaintiff's immigration status. Plaintiff's Statement of Uncontroverted Facts , Dkt. # 85 ("Pl. SUF "), ¶¶ 25-26.
On November 19, 2010, the judgment of dissolution was filed, finalizing Cyrousi and Shalini's divorce. Id. ¶ 12; Defs. SUF ¶ 26. Cyrousi was subsequently married to his second wife Yolanda Foxx from April 2011 to July 2014, though they separated "mere months after their marriage." See Goldstein Decl. , Ex. Q, 3:10-12. Cyrousi married his current wife, Patricia Goodluck, on July 1, 2015. Defendants' Reply to Plaintiff's Statement of Genuine Disputes of Fact , Dkt. # 119-1 ("Reply to Pl. SUF "), ¶ 35.
B. Procedural Background
On July 24, 2017, Plaintiff filed suit in this Court against Defendants, alleging breach of contract. See generally Compl. He alleges that Defendants have failed to provide him with financial support as the I-864 Affidavit requires. See id.
Shalini now moves for summary judgment on the grounds that Cyrousi settled his claim for I-864 support against Shalini through the Marital Settlement Agreement. Further, both Shalini and Vinod move for partial summary judgment on the grounds (1) that Cyrousi cannot prove any breach of I-864 obligations for years 2009, 2012, and 2013; and (2) that their I-864 support obligations terminated in January 2018. See generally Defs. Mot.
Cyrousi moves for summary judgment awarding him $84,977.18 in arrears plus interest and an order for continued support by Defendants under the I-864 Affidavit. See generally Pl. Mot.
II. Legal Standard
A. Summary Judgment
"A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the nonmoving party will have the burden of proof at trial, the movant can prevail *1282 by pointing out that there is an absence of evidence to support the moving party's case. See id. If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all reasonable inferences in the light most favorable to the nonmoving party. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n , 809 F.2d 626, 630-31 (9th Cir. 1987). The evidence presented by the parties must be capable of being presented at trial in a form that would be admissible in evidence. See Fed. R. Civ. P. 56(c)(2). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp. , 594 F.2d 730, 738 (9th Cir. 1979).
B. U.S. Citizenship and Immigration Services Form I-864 Affidavit of Support
The Immigration and Nationality Act forbids the admission of any alien who "is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4) ; 8 C.F.R. § 213a.2(a). Family-sponsored immigrants who would be inadmissible for this reason may become admissible if the person petitioning for the immigrants' admission signs a Form I-864 Affidavit of Support. See Shumye v. Felleke , 555 F. Supp. 2d 1020, 1023 (N.D. Cal. 2008) ; see also 8 U.S.C. § 1183a(a)(1). By signing an I-864 Affidavit, the sponsor agrees to provide support to maintain the sponsored immigrant at an annual income that is not less than 125 percent of the Federal Poverty Guidelines during the period in which the affidavit is enforceable. See 8 U.S.C. § 1183a(a)(1)(A). Once executed, the affidavit becomes a contract between the sponsor and the U.S. government for the benefit of the sponsored immigrant and of any federal, state, or local governmental agency or any other entity that provides any means-tested public benefit. Id. § 1183(a)(1)(B). Both the sponsored immigrant and the entity that provides a public benefit to the sponsored immigrant may legally enforce the Affidavit against the sponsor. Id.
An I-864 Affidavit remains enforceable until the sponsored immigrant: (1) becomes a U.S. citizen; (2) has worked or can be credited with 40 qualifying quarters of coverage under title II of the Social Security Act; (3) no longer has LPR status and departs the United States; (4) obtains in a removal proceeding a new grant of adjustment of status as relief from removal; or (5) dies. See 8 C.F.R. § 213a.2(e)(2)(i). The I-864 Form also explicitly states: "NOTE: Divorce does not terminate your obligations under this Form I-864." Plaintiff's Request for Judicial Notice , Dkt. # 84 ("Pl. RJN "), Ex. 2 ("Form I-864 "), at 8.
III. Discussion
The Court first discusses whether the I-864 Affidavit remains enforceable in light of the Marital Settlement Agreement and Defendants' other affirmative defenses. Next, the Court analyzes whether Defendants' support obligations have ended through one of the Terminating Events. Lastly, the Court addresses whether Defendants have breached their obligations under the I-864 Affidavit.
A. The Marital Settlement Agreement
Shalini contends that her obligation under the I-864 Affidavit to support Cyrousi *1283 was discharged when they signed the Marital Settlement Agreement in 2010. See Defs. Mot. 3:23-5:15; Defs. Reply 1:20-7:20. She claims that Cyrousi was aware of Shalini's obligations under the I-864 Affidavit yet he executed the Agreement as a "a final and complete settlement of all of [Cyrousi and Shalini's] rights and obligations as between them, including property rights and property claims, and the right of either Wife or Husband to spousal support." Defs. SUF ¶ 10. The Agreement further states that after the date of the agreement, "no debt or obligation will be incurred for which the other may be liable." Id. ¶ 11.
However, notwithstanding the language in the Marital Settlement Agreement, the Court concludes that the I-864 Affidavit remains enforceable under Ninth Circuit precedent. The analysis in Erler v. Erler (Erler II) , 824 F.3d 1173 (9th Cir. 2016), is instructive. In Erler II , a former immigrant wife brought suit against her ex-husband to enforce his contractual support obligations under the I-864 Affidavit he had signed as her immigration sponsor. Id. at 1175. The ex-husband argued that the I-864 Affidavit was void because the couple had signed a premarital agreement, which provided that neither party would be entitled to alimony or support from the other in the event of a divorce. See id. at 1176. The district court ruled that the premarital agreement did not void the affidavit, because "[i]f that were possible, parties could routinely rely on premarital agreements to undermine the Affidavit's goal of preventing immigrants from becoming public burdens." Erler v. Erler (Erler I) , No. CV-12-2793-CRB, 2013 WL 6139721, at *2 (N.D. Cal. Nov. 21, 2013). The Ninth Circuit affirmed, holding in no uncertain terms, "under federal law, neither a divorce judgment nor a premarital agreement may terminate an obligation of support." Erler II , 824 F.3d at 1177. It further opined that "the right of support conferred by federal law exists apart from whatever rights a sponsored immigrant might or might not have under state divorce law." Id. (quoting Liu v. Mund , 686 F.3d 418, 419-20 (7th Cir. 2012) ) (cleaned up). Therefore, under Erler II , the Marital Settlement Agreement could not have discharged Shalini's support obligations as Cyrousi's sponsor.
Defendants contend that this case is nonetheless distinguishable because (1) it involves a post-marriage settlement, as opposed to prenuptial agreement; and (2) Erler II only spoke to the existence of a defendant's I-864 obligation to the government, not to whether a plaintiff had settled his ability to privately enforce the existing obligation. Defs. Reply 4:1-5:12. Neither argument is persuasive. First, although the district court in Erler I noted-in a footnote-that the I-864 Affidavit would have superseded the terms of the premarital agreement, see 2013 WL 6139721, at *2 n.1, the Ninth Circuit did not affirm the decision on that basis, see Erler II , 824 F.3d at 1176-77. Second, Defendants' argument that Erler II only spoke to the sponsor's obligations to the government , not the sponsored immigrant, is undercut by the fact that the case was a private enforcement action and did not involve the U.S. government.
Accordingly, the Court concludes that the Marital Settlement Agreement did not absolve Shalini of her support obligations under the I-864 Affidavit. Therefore, her motion for summary judgment on this basis is DENIED .
B. Other Affirmative Defenses
Plaintiff moves for summary judgment that Defendants breached the I-864 Affidavit by failing to provide support since his separation from Shalini. See Pl.
*1284 Mot. 7:3-8:8. To prevail on summary judgment, Plaintiff must negate any affirmative defenses to his breach of contract claims. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc. , 210 F.3d 1099, 1102-03 (9th Cir. 2000). Here, Plaintiff argues that none of the affirmative defenses asserted by Defendants in their answer-including laches, waiver, statute of limitations, failure to mitigate, and unclean hands-apply here, because "there is one and only one affirmative defense available in I-864 lawsuits"-showing that a one of the five Terminating Events has occurred. Pl. Mot. 8:17-20.
Indeed, courts in this Circuit have viewed I-864 Affidavits as a special breed of contracts. In Erler II , in addition to holding that neither a divorce judgment nor a premarital agreement may void a sponsor's obligation of support, the Ninth Circuit emphasized that the purpose of an I-864 Affidavit of Support is to "prevent the admission to the United States of any alien who is likely to any time to become a public charge," and held that this purpose "is best served by interpreting the affidavit in a way that makes prospective sponsors more cautious about sponsoring immigrants." 824 F.3d at 1179. Taking heed of the Ninth Circuit's guidance and noting that the federal law clearly specifies instances in which a support obligation is terminated, district courts in this Circuit have repeatedly held that traditional contract defenses cannot be used to avoid support obligations. See, e.g. , Dorsaneo v. Dorsaneo , 261 F. Supp. 3d 1052, 1054-55 (N.D. Cal. 2017) (holding that fraud in the inducement and estoppel cannot be defenses to an I-864 enforcement action, "because it would place lawful permanent residents at risk of becoming dependent on the government for subsistence"), appeal filed , No. 18-15487 (9th Cir.); Liu v. Kell , 299 F. Supp. 3d 1128, 1133-34 (W.D. Wash. 2017) (holding that the sponsor's failure to mitigate and waiver defenses are impermissible as a matter of law); accord Mund , 686 F.3d at 421-23 (rejecting a failure to mitigate as a defense against an I-864 Affidavit because "[t]he cost, besides the sponsor's diminished incentive to screen the alien for a bad work ethic, would be the increased complication of enforcing the duty of support by giving the sponsor a defense").
Defendants assert that Plaintiff's reading of Erler II is unduly expansive. Defs. Opp. 17:17-25. They point out that neither the words "affirmative" nor "defense," nor any of Defendants' asserted defenses appeared in the Erler II opinion. Id. 17:20-22. Instead, Defendants urge the Court to look to Mergia v. Adams , 405 F. App'x 147, 147 (9th Cir. 2010), which affirmed the district court's grant of summary judgment in favor of the sponsor on the grounds that the immigrant was judicially estopped from asserting his I-864 claim, as persuasive authority that I-864 breach of contract claims are subject to standard affirmative defenses. See id. 17:26-18:8. However, Mergia was an unpublished opinion that predated Erler II and had little to no analysis on the subject. See id. And even though Erler II does not explicitly state that no ordinary contract defenses are permitted in I-864 cases, its holding supports a conclusion that any defenses that would undermine the purpose of the Affidavit are invalid.
Because the Court finds that Plaintiffs' affirmative defenses would place the immigrant at risk of becoming public charge, and because courts have enforced Congress's policy choice of placing the risk on the sponsor rather than on the state or federal taxpayers, it concludes that Plaintiffs' affirmative defenses, outside the statutory Terminating Events, do not apply here. The Court next considers whether *1285 Defendants are relieved from their support obligations because one of the specified Terminating Events took place.
C. Whether Defendants' Obligations Under the I-864 Have Been Terminated
A sponsor's obligations under an I-864 affidavit terminate only if the sponsored immigrant: (1) becomes a U.S. citizen; (2) has worked or can be credited with 40 qualifying quarters of coverage under title II of the Social Security Act; (3) no longer has LPR status and departs the United States; (4) obtains in a removal proceeding a new grant of adjustment of status as relief from removal; or (5) dies. Erler II , 824 F.3d at 1177 ; 8 C.F.R. § 213a.2(e)(2)(I).
Plaintiff is still alive and is not a U.S. citizen. Pl. SUF ¶¶ 17, 24. The parties, however, disagree on whether any of the remaining three Terminating Events apply here. Plaintiff seeks summary judgment that Defendants must provide him with continued support under the I-864 Affidavit, contending that none of the Terminating Events have occurred. Pl. Mot. 21:16. Defendants counter that Plaintiff's motion should be denied because there remains a dispute of fact as to whether Plaintiff lost his LPR status or adjusted his status in 2010. Defs. Opp. 12:21-15:8. Defendants further seek partial summary judgment that their support obligations terminated in January 2018 at the latest, when Plaintiff was credited with 40 quarters of coverage under the Social Security Act. See Defs. Mot. 9:5-12:5.
i. Loss of LPR Status or Adjustment of Status
Defendants contend that a reasonable jury could find that Plaintiff lost his LPR status and left the United States in 2010, such that their support obligations terminated then.
In early 2010, Plaintiff left the United States for Germany. Defs. SGF ¶ 109. On February 2, 2010, about two weeks before his conditional LPR status was to expire, Plaintiff executed and submitted a I-751 petition to change his status from a conditional LPR to an LPR. See id. ¶ 110. When Plaintiff returned to the United States in June 2010, immigration authorities at the airport informed him that his green card had expired and confiscated it. Id. ¶¶ 112-13. Plaintiff then retained attorneys to assist with his I-751 petition and again departed for Germany and stayed abroad for several months while his application was pending. Id. ¶¶ 114-15. Plaintiff's I-751 application was granted on November 2, 2011, and he was provided with a "10-year green card." Id. ¶¶ 116-17.
Defendants argue that this evidence creates a factual dispute as to whether their support obligations were terminated by Plaintiff's loss of status or adjustment of status. As to the loss of status, Defendants claim that the expiration and confiscation of Plaintiff's green card, coupled with Plaintiff's time abroad, support the conclusion that Plaintiff lost his LPR status, triggering a Terminating Event. Defs. Opp. 14:15-23. The Court disagrees.
Conditional LPRs are lawful permanent residents who have been admitted to the United States for a period of two years. See 8 C.F.R. § 216.1. They possess all "rights, privileges, responsibilities and duties which apply to all other lawful permanent residents ...." Id. Upon the expiration of two years, a conditional LPR maintains his status as an LPR unless (1) he fails to timely file his petition for unconditional status; (2) such a petition is denied; or (3) his status is affirmatively terminated by the government. See 8 U.S.C. § 1186a(c)(2)(A) (lack of timely petition), 1186a(c)(3)(C) (petition denied), 1186a(b)(1)
*1286 (affirmative termination). To maintain one's status as an LPR at the end of the two-year period, a conditional LPR must timely (within ninety days of the expiration date) file a Form I-751 petition. See 8 C.F.R. § 216.5. If the I-751 petition is timely filed, the LPR status is automatically extended until the petition is adjudicated. Id. § 216.4(a)(1).
Given that Plaintiff had timely filed his I-751 petition, his conditional LPR status was extended automatically. See id. As such, the Court finds that there is no genuine dispute of fact that Plaintiff never lost his LPR status, and therefore the loss of LPR status terminating event does not apply here.
Defendants' contention that there is a factual issue as to whether Plaintiff was subject to removal and was granted an adjustment of status is equally meritless. First, an "adjustment of status" does not refer to any changes of immigration classification. Instead, it refers to a process in which aliens with non-immigrant immigration status who are physically present in the United States can apply for LPR status without having to return to their home country to obtain an immigrant visa. See 8 U.S.C. § 1255. Plaintiff's I-751 petition, although a process that changed his immigration classification, was not an "adjustment of status." Second, because Plaintiff's conditional LPR status extended automatically when he filed the I-751 petition, there is no evidence that Plaintiff was placed in removal proceedings.
In sum, the Court finds that neither the loss of LPR status nor adjustment of status terminating events occurred in this case.
ii. Worked or Credited with 40 Quarters of Coverage
A sponsor's obligation for support under the I-864 Affidavit terminates if the immigrant "(i) has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act [ 42 U.S.C. §§ 401, et seq. ] or can be credited with such qualifying quarters ... and [ (ii) ] did not receive any Federal means-tested public benefit ... during any such period." 8 U.S.C. § 1183a(a)(3)(A). Title II of the Social Security Act defines a "quarter of coverage" as "each portion of the total of the wages paid and the self-employment income credited ... to an individual in a calendar year which equals the amount required for a quarter of coverage in that calendar year ...." 42 U.S.C. § 413(a)(2)(A)(ii). In other words, the quarters are calculated based on the annual income, no matter when during the year a person did the work. For example, if the total of one's wages and self-employment income for a calendar year is more than twice, but less than three times, the amount required for a quarter of coverage, one is credited with two quarters of coverage for the year. 20 C.F.R. § 404.143(a). The amount required for a quarter of coverage is determined by the Commissioner of Social Security each year and published in the Federal Register. See id. § 413(d).
Both sides agree that Plaintiff earned at least 23 quarters of coverage between 2007[2] and 2018. See Defs. SUF ¶ 33. However, the parties disagree on the number of quarters of coverage Plaintiff earned in 2010.
Plaintiff admits that he earned $4,945 in 2010, which was reported on his tax return as self-employment income. Defs. SUF ¶ 33. In 2010, $4,945 was enough to earn *1287 four quarters of coverage. Id. ¶ 32. However, Plaintiff argues that this income cannot be counted as quarters of coverage because it is not reflected in his Social Security Administration ("SSA") statement. Pl. Opp. 9:20-24. He contends that the SSA statement should be "treated as the complete and accurate statement of a party's earnings for I-864 purposes." Id.
However, the relevant statute does not state that the sponsor's support obligation terminates when an immigrant "is" credited with 40 quarters of work but instead when an immigrant "has worked" or "can be credited with" 40 qualifying quarters of coverage. See 8 U.S.C. § 1183a(a)(3)(A) (emphasis added). Both the Social Security Act and its implementing regulations provide that the self-employment income that Plaintiff admits to receiving in 2010 and reported to the IRS counts toward quarters of coverage. See 42 U.S.C. §§ 412(b), 413(a)(2)(A)(ii) ; 20 C.F.R. § 404.144. That these quarters are not reported on his SSA statement is of little importance. In fact, even the SSA recognizes that there may be errors in an individual's statement and allows individuals to correct the record. See How to Correct Your Social Security Earnings Record, Social Security Administration, https://www.ssa.gov/pubs/EN-05-10081.pdf (last visited June 21, 2019).
In sum, the Court concludes that Plaintiff has earned enough to be credited with four quarters of coverage in 2010. Therefore, by the end of 2017, Plaintiff had 27 quarters of coverage based on his own earnings.[3]
In addition to the quarters earned by the immigrant, an immigrant may also be credited with all "qualifying quarters worked by a spouse" during their marriage if the immigrant "remains married to such spouse or such spouse is deceased." 8 U.S.C.§ 1183a(a)(3)(B). Plaintiff has been married to Goodluck since July 1, 2015, see Plaintiff's Statement of Disputed Facts , Dkt. # 97-1 ("Pl. SGF "), ¶ 35, and the parties do not dispute that she accrued 12 qualifying quarters of work during her marriage based on her SSA statement, see id. ¶¶ 36-40. In addition, it is undisputed that Goodluck earned more than $1,320-the amount needed to earn one quarter of coverage in 2018-in January 2018. Id. ¶¶ 31, 39.[4]
In sum, Plaintiff can be credited with his own twenty-seven quarters and Goodluck's fourteen quarters, for a total of forty-one quarters as of January 2018. As such, Defendants' support obligations were discharged by January 2018. Therefore, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's breach of contract claims to the extent they are based on Defendants' support obligations after January 2018. Plaintiff's motion for summary judgment requiring Defendants to continue their support obligations is DENIED .
*1288 D. Breach of Contract
Having decided that Defendants' obligations terminated in January 2018, the Court now turns to whether Defendants breached the Affidavit from 2009 to 2018. Plaintiff claims that Defendants breached their I-864 obligations based on evidence that Defendants have not made any payments to him since October 1, 2009. See Pl. Mot. 7:20-26. Defendants counter that there still remain genuine disputes of fact as to whether they breached as to the years 2010, 2011, and 2014 through 2018. Defs. Opp. 3:3-9:2. Further, Defendants contend the Court should grant partial summary judgment in their favor as to the years 2009, 2012, and 2013. See Defs. Mot. 5:17-9:3.
To start, the parties do not dispute that Plaintiff's income was more than 125% of the Federal Poverty Guidelines for a one-person household in 2012 and 2013. Therefore, the Court GRANTS partial summary judgment in favor of Defendants that there was no breach in 2012 and 2013. As for the remaining years, the Court finds that there remain genuine disputes of fact as to whether Defendants breached their support obligations.
Plaintiff claims that Defendants breached the I-864 Affidavit during the remaining years because they never paid him. Pl. Mot. 7:20-26. However, the Affidavit does not require Defendants to provide payments of 125% of the poverty guidelines every year. Rather, the Affidavit requires them to provide Plaintiff with "any support necessary" to maintain him at 125% of the poverty guidelines. See Form I-864 at 7.
Plaintiff's reliance on his SSA statement, tax returns, and receipts from his work at Lyft are insufficient to establish breach, because there remain disputes of fact as to whether he received other resources and benefits. A factfinder would not be required to infer from Plaintiff's evidence that they "necessarily list every form of income that Plaintiff received in those years." Shumye , 555 F. Supp. 2d at 1029. Moreover, Defendants have pointed to both direct and circumstantial evidence that suggests that Plaintiff's income may not have dipped below the requisite level, disputing Plaintiff's claims that Defendants breached their support obligations. For example, Defendants claim they provided Plaintiff with clothing, housing, utilities, and other expenses, and paid for his credit card and phone bills in 2009 and 2010. Defs. SGF ¶ 47. Plaintiff testified to earning unreported income from selling his car in 2010. Id. ¶ 50. He states that he rented an apartment throughout the years, yet it is unclear whether his reported income alone was enough to cover the rent. See id. ¶¶ 58, 67. He worked as a clothing designer since 2014 and purchased equipment to print his designs on t-shirts. See id. ¶¶ 69, 75. Although Plaintiff claims he "never came close to selling a single shirt," Pl. Reply 3:11-13, Defendants have submitted a print-out of Plaintiff's website that indicates that various items were sold, see id. ¶ 77.
Most importantly, Plaintiff received financial support from his current wife Patricia Goodluck. Plaintiff cites to Erler II for the proposition that no sources of support other than his own reported income are relevant to the breach and damages analysis. Pl. Mot. 17:21-18:2. However, Erler II explicitly limited its holding to non-spouse housemates by emphasizing it was not considering a case where the sponsored immigrant had remarried. In such a case, the Ninth Circuit held, "it may be appropriate to impute all or part of the spouse's income to the sponsored immigrant." Erler II , 824 F.3d at 1179-80 n.3. And this makes sense here. Both states of Plaintiff's and Goodluck's residence, California and Texas, are community property *1289 states, where property acquired during marriage, including one's income, belongs to both spouses. See Cal. Fam. Code § 751 ; Tex. Fam. Code § 3.002.
In sum, the Court finds that there remain genuine disputes of fact as to whether Defendants failed to provide support necessary to "maintain" him at the 125% of the Federal Poverty Guidelines.
In conclusion, the Court GRANTS Defendants' motion for summary judgment as to years 2012 and 2013, but DENIES the motion as to 2009. The Court also DENIES Plaintiff's motion for summary judgment as to his claims for the years 2009-2011 and 2014-2018.
III. Conclusion
The Court GRANTS in part and DENIES in part Defendants' motion for summary judgment. Defendants' motion is GRANTED as to Plaintiff's claim for support in years 2012 and 2013 but DENIED as to year 2009. Defendants' motion is GRANTED as to Plaintiff's claim for continued support, which was terminated as of January 2018.
The Court further GRANTS in part and DENIES in part Plaintiff's motion for summary judgment. The motion is GRANTED as to the inapplicability of Defendants' affirmative defenses other than the statutory Terminating Events. However, the motion is DENIED as to Plaintiff's request for an award of damages and continued support by Defendants.
Remaining for trial is Plaintiff's breach of contract claims to the extent they are based on Defendants' alleged failure to meet their obligations under the I-864 Affidavit to provide the support necessary to maintain him at 125% of the Federal Poverty Guidelines for the years 2009, 2010, 2011, 2014, 2015, 2016, 2017, and January 2018.
IT IS SO ORDERED.

As a preliminary matter, both sides assert evidentiary objections. See Dkts. # 95, 119-2, 119-3. To the extent that the Court relies on objected-to evidence, it relies only on admissible evidence and, therefore, the objections are OVERRULED . See Godinez v. Alta-Dena Certified Dairy LLC , No. CV 15-01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016). Plaintiff has also filed a request for judicial notice of various documents. See Plaintiff's Request for Judicial Notice , Dkt. # 84 ("Pl. RJN "). The Court GRANTS Plaintiff's request as to the Federal Poverty Guidelines from 2009 through 2019 and the Form I-864 Affidavit, because they are proper subjects for judicial notice. Plaintiff's request is DENIED as to the other documents.

Plaintiff's SSA statement shows earnings in the United States starting in 2007. See Pl. SUF ¶ 18.

Plaintiff also admits that he earned $3,356 in 2018, which would qualify as two quarters of coverage. Declaration of Pedram Cyrousi , Dkt. # 82, ¶ 18. However, because the Court finds that Plaintiff was already credited with 40 quarters by January 2018 based on his current wife's income, it does not consider Plaintiff's 2018 earnings in its calculations.

Plaintiff makes a half-hearted attempt to argue that it is "premature" to consider Goodluck's qualifying quarters because her quarters are only imputed to Plaintiff while they remain married or Goodluck dies. Pl. Opp. 10:16-11:4. The Court need not speculate what would happen to Plaintiff and Goodluck's marriage in the future-for the purposes of the qualifying quarters calculation, it only needs to look at whether Plaintiff qualifies for the quarters now.